# EXHIBIT E

PILLSBURY & LEVINSON LLP

PHILIP L. PILLSBURY, JR.

**Overview of Expert Conclusions:**

As detailed in the "Summary of Expert Conclusions" set forth below, I have been retained to evaluate, in the context of California bad faith and insurance practice, the potential exposure for damages for bad faith, including punitive damages, that USF&G faced in a jury trial in 2002. That case settled in June 2002, before the Phase 1 jury returned, for $987.5 million. I have been asked to consider whether some or all of that settlement payment should be considered, on an objectively reasonable basis, to reflect exposure for bad faith and punitive damages.

Had the case not settled, a California jury hearing the evidence would have made a decision on damages for bad faith and punitive damages arising out of USF&G's conduct. My conclusions as to what a jury might have found in 2002 are based on concrete amounts — such as the established value of the accumulated default judgments (plus interest), the value of *Brandt* fees, and the range of punitive damages authorized by case authority as it existed in June 2002, when the case settled. In other words, what could we expect lawyers for Western MacArthur to "blackboard" for bad faith and punitive damages, and how would a California jury respond, based on the evidence that was developed? This is a very familiar process for trial lawyers evaluating damage ranges as a case proceeds to trial. Certainly, as a trial lawyer, I have done this many times.

As is reflected in the "Summary of Expert Conclusions" set forth below and the attached "Appendix A: Supporting Evidence to Summary of Expert Conclusions," the evidence shows that the following occurred:

- Western Asbestos was a distributor and installer of asbestos-containing products and, it was alleged, caused significant bodily injury over the time period that USF&G's policies were in effect.

- In 1967, Western MacArthur acquired Western Asbestos in such a way that it became liable as a successor corporation for the asbestos-related liability of Western Asbestos. Western MacArthur alleged that Western Asbestos had assigned certain liability insurance policies to it, including those issued by USF&G to Western Asbestos for a period that included 1948 to June 1960. None of those policies has been found.

- Western MacArthur began investigating insurance coverage in 1982 and reached out to USF&G to inquire as to coverage based on information it had received that USF&G was an insurer of Western Asbestos. USF&G responded that it had "no records" of any insuring relationship and no policies insuring Western Asbestos. In fact, USF&G had records at the time, in 1982, including records reflecting that its claims agents had

confirmed liability coverage for Western Asbestos more than 300times. As a matter of background and context in California, an insurer is charged with constructive knowledge of all material facts that a reasonable investigation would have revealed.[1]  Therefore, USF&G is charged with knowing, when it denied the existence of records, that it had many records showing that it had issued liability insurance policies to Western Asbestos, and that those liability insurance policies would potentially have covered alleged bodily injury claims that were the subjectof Western MacArthur's inquiries.

- By 1983, Western MacArthur faced many hundreds of asbestos lawsuits, which alleged that Western MacArthur was responsible for the asbestos-containing products distributed or installed by its predecessorWestern Asbestos.  Western MacArthur learned that USF&G had insured Western Asbestos against liability claims for many years and so WesternAsbestos tendered these pending asbestos lawsuits to USF&G.

- As a matter of background and context in California, the existence of any potential for coverage obligates the insurer to defend.  Despite a growing body of evidence (as described below) reflecting an insuring relationship between USF&G and Western Asbestos, and at the very least factual issues concerning whether USF&G had a coverage obligation to Western MacArthur, USF&G refused to defend.

- Internally, USF&G was aware of a growing tide of lawsuits alleging bodily injury to individuals exposed to products containing asbestos.  Two very large companies, Johns Manville and UNR Industries, had been forced into bankruptcy and Western Asbestos had been a major distributor for Johns Manville products.  USF&G knew or should have known that Western Asbestos, and therefore Western MacArthur, would have potential liability for bodily injury claims as a distributor of these products.

- The records at USF&G then reflected that, internally, USF&G ordered that files be purged of documents.  These purging orders were broad enough that they would have included documents reflecting an insuring relationship between USF&G and Western Asbestos to the extent they then existed.

- In 1991 and 1992, Western MacArthur continued to supply USF&G with evidence that USF&G had, in fact, issued policies to Western Asbestos, but USF&G continued to refuse to acknowledge the existence of any insuring relationship with Western Asbestos.

---

[1] *KPFF, Inc. v. California Union Ins. Co.* (1997), 56 Cal. App.4th 963.

- Western MacArthur continued to press USF&G to defend it from bodily injury claims by bringing suit against USF&G in 1993. USF&G continued to refuse to defend, even though at least one USF&G claims examiner had concluded that Western MacArthur had sufficient evidence to prove the existence of one or more policies. USF&G also began to maintain reserves for expense and indemnity on the very claims that it refused todefend; such reserves amounted to $800,000 for expenses and $1.2 million for indemnity by August 1994. As a matter of background and context, in California, the establishment of such significant reserves is an indication that an insurer's duty to defend has been triggered.

- Western MacArthur had been defended by other insurers, but in or about 1995 or 1996, it was no longer being defended or indemnified byany other such insurer. Western MacArthur determined that it couldno longer afford to defend or settle the asbestos lawsuits pending against it, which by then numbered in the thousands.

- Beginning in 1997, and continuing over a period of more than 5 years, attorneys for asbestos plaintiffs filed for default judgments, and proceeded to submit evidence of bodily injury damages against Western MacArthur, and in that manner secured actual default judgments of nearly $1.85 billion.

- Western MacArthur continued to press its bad faith claims against USF&G, seeking compensatory damages (which would have included the default judgments entered against it, its own cost of defense, its costs of establishing coverage, plus interest) and also punitive damagesfor USF&G's alleged fraud, malice and oppression, which forms a statutory basis, in California, for the award of punitive damages.

- In the course of Western MacArthur's litigation, lawyers for Western MacArthur developed overwhelming evidence of USF&G's bad faith refusal to defend. Some of the highlights of Western MacArthur's evidence was the following:

- USF&G failed to investigate whether coverage existed, falsely denied the existence of records, and failed to defend Western MacArthur when called upon to do so;

- USF&G destroyed and concealed documents pertaining to liability insurance coverage issued by USF&G. The destruction of documents included not only the "purge orders," but also the "donation" of key insurance documentation, to an obscure museum in Baltimore. Even after Western MacArthur — by remarkable happenstance — learned of this "donation" and insisted that the documents be produced forthwith, USF&G sent representatives, including its Claim Group Counsel, into the obscure museum to remove documents before they could be produced.

3

Western MacArthur sought a "spoliation" jury instruction, which, if given to the jury, would have permitted the jury, if it found that USF&G willfully suppressed, destroyed, concealed, or otherwise rendered unavailable any documents or information pertaining to any insurance coverage that was sold by USF&G to Western Asbestos, to draw an inference that there was something damaging to USF&G contained in those documents or information, and that this evidence was favorable to the plaintiffs Western MacArthur Company and MacArthur Company.

- USF&G obstructed efforts by Western MacArthur to discover documents and witnesses showing the existence of coverage. For example, USF&G in January 1983 falsely denied the existence of records from the relevant time period. Then, in the course of litigation, USF&G submitted, at deposition, a "person most knowledgeable" who, as the spokesman for the company, claimed that USF&G did not know of any witnesses within the company who had knowledge of an insuring relationship between USF&G and Western Asbestos; that it was not aware of what the prefix "CLP," in the context of USF&G liability policies, meant; that, with respect to liability policies issued by USF&G, it was not aware of the significance of "claims registers"; and that it was not aware of the identity of its own authorized agent, Herbert Stockton, who had issued USF&G liability policies to Western Asbestos for many years.

- Western MacArthur's lawyers moved to compel answers from USF&G's "Person most knowledgeable," Robert Kostecki, who had been instructed by USF&G's counsel not to testify — on the grounds of attorney-client privilege and work-product protection — about the possible existence of past or present USF&G employees who might have knowledge of the insuring relationship between USF&G and Western Asbestos. The Court granted Western MacArthur's motion, compelling Mr. Kostecki to respond, and Mr. Kostecki then revealed the identity of USF&G's employees who had knowledge of the insuring relationship between USF&G and Western Asbestos, as well as several claims representatives who then testified under oath that they were fully aware that Western Asbestos was an insured of USF&G. In addition, Mr. Kostecki then testified that he was aware of the meaning of the prefix "CLP" and that it applied to liability policies issued to companies like Western Asbestos.

- Armed with this new knowledge of witnesses and documents, Western MacArthur took the depositions of numerous USF&G witnesses, who confirmed the insuring relationship between USF&G and Western Asbestos.

- Western MacArthur's lawyers also took the deposition of the lawyer who had removed documents from the "donation" to the Baltimore Museum of Industry (as described in more detail below). This lawyer admitted that,

since the summer of 1998, there had been a general consensus atUSF&G that there was an insuring relationship between with USF&G and Western Asbestos.

- By May 2002, Western MacArthur's attorneys had amassed a remarkable string of victories against USF&G's attempts to avoid liability for bad faith.

- Indeed, an Alameda County Superior Court judge had ruled that USF&G's defenses, including the defense that there was never a valid assignment of the Western Asbestos policy to Western MacArthur, involved issues of fact, and thus USF&G faced a trial before a jury on Western MacArthur's bad faith claim.

- Nevertheless, notwithstanding being aware of all such evidence — and even though USF&G had internally reached a general consensus ofan insuring relationship between USF&G and Western Asbestos and notwithstanding what were at the least fact issues concerning whether USF&G had a coverage obligation to Western MacArthur by reason of assignment — at no time did USF&G proffer a defense to the asbestos claims Western MacArthur faced.

- The first phase of Western MacArthur's case against USF&G proceeded to trial in California in early 2002. By June of 2002, before the jury was able to return with a verdict in Phase 1 of Western MacArthur's caseagainst USF&G, USF&G settled all claims against it, including bad faith claims, for $987.5 million.

- For the reasons I have detailed in the following "Summary of Expert Conclusions," USF&G's $987.5 million settlement avoided the significant risk of a verdict awarding plaintiffs approximately $2 billion in compensatory damages (including for default judgments, interest, and *Brandt* fees), with the possibility of significant punitive damages in addition (which, under the judicial standards existing in 2002,could easily have exceeded $4-5 billion).

- Thus, the total exposure that USF&G faced on the bad faith claims, and for interest, *Brandt* fees and punitive damages related thereto, in itself far exceeded the $987.5 million settlement. By comparison, representatives of USF&G and its parent company, St. Paul, assessed USF&G's exposure on Western MacArthur's asbestos liabilities as of 1997 — at a timebefore significant default judgments were entered and began to accumulate — at a level of $30-50 million. In my opinion, an overwhelming majority of the $987.5 million settlement was on account of USF&G's exposure toextra-contractual liability for failure to defend and other bad faith conduct as well as punitive damages.

acknowledging that there is at least a question of fact as to coverage, and thus has acted in bad faith."[17]  The court further found that the standing issue raised by USF&G was not a bar to moving forward on bad faith liability.  To the contrary, the trial court held that Western MacArthur had presented evidence to create a triable issue of fact on the question of whether USF&G's assertion of such a lack of standing defense was "part of a larger pattern of bad faith conduct by USF&G."[18]  Ultimately, following USF&G's June 3, 2002 settlement with Western MacArthur and the asbestos plaintiffs, the court found, as a matter of fact and law, that the 1999 express assignment by Western Asbestos to Western MacArthur was valid under California law and was effective retroactively to May 9, 1997.[19]

**USF&G's Awareness of the Potential for Significant Liability for Asbestos-Containing Products at the Time It Instituted Its Purge of Insurance Documents**

By the 1980s, the insurance industry had become aware of a wave of asbestos litigation facing its insureds.  By this time, companies engaged in asbestos mining and the manufacture, installation, distribution, or sale of asbestos products faced an overwhelming number of claims from workers seeking damages for asbestos-related injuries and death.  The multitude of these claims and the amount of money at stake were a very real threat to these asbestos involved companies forcing some large companies into bankruptcy, such as UNR Industries and Manville Corporation.  Not only was the insurance industry aware of this problem, but the public was also aware of the scope of this problem as can be seen in the following publications.

- "Asbestos Liability Worries Insurers," *New York Times* (4/22/1980):

  - "Faced with a rising number of lawsuits against manufacturers for asbestos-related diseases, insurance companies are bracing for what may be the most costly liability settlements in the history of their industry."

  - "[T]he Asbestos Litigation Reporter, estimates that more than 6,000 product liability suits are now pending."

- "Report Paints Grim Picture of Asbestos," *Washington Post* (12/30/1981):

---

[17] 9/12/2001 Order Denying USF&G's Motion for Summary Adjudication on Plaintiffs' Bad Faith Claims, p. 2, ¶ 3.

[18] 9/12/2001 Order Denying USF&G's Motion for Summary Adjudication on Plaintiffs' Bad Faith Claims, p. 2, ¶ 4.

[19] 7/1/2002 Order on Phase 1 Issues Submitted to the Court for Decision, USFG0283890, at USFG0283901.

- o "More than 200,000 of the 9 million surviving workers who have been exposed to asbestos during the past 40 years will die of asbestos-associated cancer by the end of the century, an internal Department of Labor report concludes."

- o "The increase in litigation also could hurt the financial stability of many insurance companies that end up paying the monetary damages, the report says."

- "The Asbestos Mess," *Washington Post* (4/27/1982):

  - o "Occupational exposure to asbestos, which is now known to cause disability and death . . . has created a legal nightmare."

  - o "[T]he number of victims is so large — it is expected soon to reach 8,000 to 10,000 a year and to remain at that level until the end of the century. . . ."

  - o "[T]he legal system is now awash in a flood of claims and cases. Workers are suing manufacturers; the manufacturers are suing their insurance companies; and the insurance companies are suing each other."

- "The Economic Consequences of Asbestos-Related Disease," by Paul W. MacAvoy, in association with J. Karr and P. Wilson, Yale Schoolof Organization and Management (January 1982):[20]

  - o "The large payments that will result from asbestos product liability suits are likely to go beyond the financial capacity of the insurance industry to meet them as well as their other obligations." (pg.85)

  - o "While the many variables that affect future liabilities cannotbe determined with certainty, the best estimate of the present value of future payments of $38.2 billion represents almost, if not completely, all of the relevant insurance industry assets at the present time."  (pg. 85)

  - o "Given this condition, a policy which allows the continuance ofthe present system of asbestos claims compensation will result in a number of insurance company and perhaps asbestos company bankruptcies."  (pg. 85)

- James S. Kakalik, et al., "Costs of Asbestos Litigation," RAND (1983):[21]

---

[20]  Financial support for data collection and analysis was provided by Commercial Union Insurance Company.

13

- o "The resolution of disputes regarding asbestos-related diseaseshas become one of the critical problems facing the American civil justice system." (pg. iii)

- o "Exposure to asbestos and consequent litigation involve[s] potentially enormous personal and economic stakes: Approximately 24,000 people had filed product liability lawsuits claiming asbestos-related injury as of March 1983. Many times that number have been exposed to asbestos, and the potential liability of the defendant firms may run into the billions of dollars." (pg. v)

- o "About $1 billion in compensation and litigation expenses was spent on asbestos product liability litigation from the early 1970s, when the first claims were closed, through the end of 1982; of that total, about one-third has been provided by defendants and two-thirds by insurers." (pg. v)

- o "The basic uncertainty over insurance coverage has severely complicated relations between defendants and insurers, and has itself spawned a large number of lawsuits." (pg. 4)

- o "The investment firm of Conning & Company has estimated that the insurance industry's ultimate liability for asbestos claims will be in the $4 to $10 billion range. The firm estimates the total number of claims filed by the year 2010 will be in the range of 83,000 to178,000, which means at least 59,000 new claims above the 24,000 filed as of March 1983." (pg. 10)

- 5/8/2002 Mark Peterson (Western MacArthur Expert) Trial Testimony:

- o ". . .[F]rom personal experience I know that [insurers] were aware of and concerned about these [growing asbestos] liabilities as early as 1981 and 1982 when I had conversations with insurance company representatives at RAND and other places." (4169:22-4170:2)

- o USF&G was "one of the companies that provided money to RAND to do the research that I was doing, that other people that — were doing at the time. And so they — they participated in — supporting the work and were kept up to speed, kept up to date as to what we were doing." (4170:3-12)

- o "Any — any company or individual that contributed money that went to support the research was given copies of all of the publications and

---

[21] Seventeen major defendants as well as 12 major insurers contributed data to this report.

work, and they were invited to attend briefings where the work was described and discussed. So they [USF&G], like any contributor, would have had it directly." (4170:18-22)

o  The MacAvoy study was widely disseminated to persons interested in asbestos litigation including insurance companies. (4171:21-4172:15)

o  The Conning Company study published in 1982 or 1983 was widely disseminated to the insurance industry. (4172:16-4173:9)

USF&G itself acknowledged that: "The insurance industry had by 1982 paid out over $1 billion for damages and expense on about 30,000 asbestos claims, most of which involved injury to shipyard and factory workers exposed to asbestos in the workplace. Future estimates run from $4 to $87 billion and 180,000 additional claims by the turn of the century. The courts have recognized the right of injured workers to bring suit against non-employer defendants, *e.g.* mining companies, manufacturers, etc."[22]

**Western Asbestos, on Behalf of Itself and as Predecessor of Western MacArthur, Seeks USF&G's Records of Coverage and Tenders Defense of Claims to USF&G**

In 1982, Western MacArthur hired an investigator, Thad Eaton, who on December 27, 1982 notified USF&G's San Jose office that it believed that its predecessor, Western Asbestos, had been insured by USF&G for a very long period of time. Mr. Eaton asked that the manager of the San Jose branch office check USF&G's records to confirm the coverage. But just ten days later, on January 6, 1983 — with the New Year holiday intervening — Richard Thompson, the manager of the USF&G branch office, responded to Mr. Eaton that there were "no records" for that time period. A trier of fact could easily draw the inference that the Eaton request on behalf of Western MacArthur was rejected with no investigation whatsoever, since the rejection came on the heels of year-end holidays, and no evidence of any investigation of any kind whatsoever by USF&G in response to Eaton's request was ever revealed. At deposition, Thompson was unable to recall having conducted any investigation.[23] In fact, the branch manager's "no records" statement was completely false: At the time of the Eaton request, USF&G had claims registers, claims drafts, indexes to claim files maintained on file cards, and other documents

---

[22] 10/20/1988 USF&G Department Circular: Commercial Lines No. 4-88, USFG0103944-55 at 48.

[23] 5/3/1996 Deposition of Richard C. Thompson at 66:18-26, 107:14-24, USFG0622343.

showing unquestionably that USF&G had insured Western Asbestos for liability for more than a decade.[24]

On May 5, 1983, Joseph Kelly, the former Secretary of the Board of Directors of Western Asbestos, then wrote a letter to USF&G's home office tendering the defense of Western Asbestos Company either as a named defendant or as predecessor in interest to Western MacArthur. USF&G never responded. Over 12 years later — in 1995 — USF&G claimed by testimony of Robert Kostecki, its designated "Person Most Knowledgeable," that it could not locate a copy of Kelly's letter in its files nor any response to Kelly's letter from USF&G.[25] A similar tender letter was simultaneously sent to another Western Asbestos insurer, General Accident, to which General Accident responded, which would tend to support the conclusion that Mr. Kelly's letter was sent to USF&G as well. [26]

**USF&G Commences the "Purge" of Insurance Documents**

By 1984, USF&G's top executives complained that lawsuits were causing USF&G to suffer the worst underwriting losses in its history:[27]

- USF&G, which had in fact insured Western Asbestos for this type of loss, was very concerned about covering these kinds of claims and thethreat to its own profits.

---

[24] *See* pp. 27-30, below.

[25] 11/17/1995 Robert Kostecki Dep. Tr. 166:2-23, USFG0609848. As we will see, Western MacArthur sought two instructions on spoliation of evidence. 1/1/2002 Plaintiffs Western MacArthur and MacArthur Company's Supplemental Trial Brief In Support Of Request For Jury Instructions Regarding USF&G's Spoliation and Suppression Of Evidence, USFG0051872-USFG0051904, at 897-900. It is likely that a jury, following these instructions, would find that USF&G indeed had received Mr. Kelly's May 5, 1983 letter and had destroyed it in the purge of documents initiated in 1984. At the very least, USF&G faced a significant risk that a jury would find USF&G indeed had received Mr. Kelly's May 5, 1983 letter, that USF&G recognized it was notice of a long-tail asbestos claim that implicated USF&G's coverage, and that USF&G had destroyed it in the purge of documents initiated in 1984.

[26] Even assuming that a jury concluded that USF&G never received Kelly's tender letter, USF&G received the same information by August 1991 whenWestern MacArthur, through Hardin, Cook's tender letter, made USF&G fully aware of the same positions made by Western Asbestos in its 1983 tender letter: 1) Western MacArthur, now found to be successor in interest to Western Asbestos, tendered the defense of asbestos-related claims to USF&G; and 2) USF&G was the liability carrier for Western Asbestos during the most significant periods of asbestos exposure. USFG0054617.

[27] 1/1/1984 Excerpt from the 1984 USF&G Annual Report and Trends, USFG0052549, at USFG00052551.

16

Case 1:02-cv-02960-LMM   Document 213-6   Filing Date 09-100-6   Page 12 of 29   INDEX NO. 604517/2002

RECEIVED NYSCEF: 02/21/2017

    o  1984 USF&G Annual Report: "A Message From The Chairman." "Dear Fellow Employees:  The year 1984 is now history and there is nothing any of us can do to change those things that had severe impacts on the results of our company.  Nineteen eighty-four, the worst year in the history of the Company in underwriting results, was also the sixth year of consecutive declines in those underwriting results."[28]

    o  1985 USF&G Annual Report:  "A Message From The Chairman and President."  "One of the contributing factors to our unfavorable underwriting results in recent times has been the unpredictability of the civil justice system. . . .  The unpredictability of the present civil justice system has made it impossible for anyone to determine accurately the size or the frequency of losses in many lines of insurance."[29]

    o  "Bodily injury claims involving toxic or hazardous substances are on the increase."[30]

But in 1984, USF&G then commenced a process calculated to try to make it impossible for policyholders to prove coverage through USF&G's own documents:  it ordered the mass destruction of documents that might reveal policies and coverage for insureds — like Western Asbestos.

- Western MacArthur developed evidence that would support the inference that USF&G intentionally and systematically destroyed evidence of its coverage of its insureds (including Western Asbestos) as a result of a set of directives promulgated in an attempt to eliminate from filesdocuments that could show an insuring relationship.

- "It will be necessary that each department head and the key people in your department take the time to purge your files of unneeded material."[31]

- The new document destruction policy mandated the "purging of each file, not just files that can be discarded in entirety," mandated that doubts be resolved "in favor of discarding, unless there are legal restraints," and

---

[28] 1/1/1984 Excerpt from the 1984 USF&G Annual Report and Trends, USFG0052549, at USFG0052551.
[29] 1985 USF&G Annual Report, USFG0052552, at USFG0052555.
[30] 12/6/1985 USF&G Administrative Services Circular No. 5-85 re: Claim Department Guidelines for Claims Involving Toxic or Hazardous Waste Substances, USFG0650587.
[31] 3/14/1984 USF&G Memo from Karl H. Doerre (Executive VP) re:  File Retention and Destruction Policy Of Department, USFG0152090.

FILED: NEW YORK COUNTY CLERK 02/21/2017 08:33 PM
NYSCEF DOC. NO. 477

Case 1:04-cv-02966-LAK Document 213/16 Filed 11/13/17 Page 13 of 29.

INDEX NO. 604517/2002
RECEIVED NYSCEF: 02/21/2017

admonished that "we must be absolutely sure that we have thoroughly cleaned existing files."[32]

- "All existing departmental files are to be in full compliance . . . , including having been completely purged of all obsolete and duplicate material."[33]

- "The program has been clearly outlined, and is to be completed no later than May 15, 1984."[34]

- Randolph Rohrbaugh (USF&G VP Quality Assurance) testified that, at a meeting concerning this document destruction program among USF&G management and attorneys in 1984, there was a discussion as to whether USF&G should retain its records information about insureds' policies given that insureds would bear the burden of proof as to those policies.[35] A trier of fact could conclude that the discussion of "burden of proof" in this context suggests that the destruction of documents was not motivated by concerns about storage space, but instead reflected an effort by USF&G to destroy documents that could have required USF&G to defend and indemnify its insureds.[36]

**Concerned About Its Own Exposure for Coverage, USF&G Curtails the Document Destruction Process**

Beginning in the late 1980s, USF&G came to recognize that, in California (and elsewhere), policyholders could establish their entitlement to coverage from secondary evidence, even if the original policy could no longer be located. Thus, beginning in 1988, USF&G began to salvage as much as it could of records still existing after the purge had been ordered in the mid-1980's, and it did this so as to be able to combat secondary evidence by policyholders as to the terms and conditions of the policies. USF&G was particularly concerned that policyholders of policies issued decades earlier might contend that there were no aggregate limits (and therefore there was essentially unlimited coverage) unless USF&G could demonstrate from records of its own that aggregate limits existed.

- USF&G Modified its Records Destruction Program once it believed retention of certain documentation was to its own advantage in order to

---

[32] 4/30/1984 Letter from Charles Watson (VP) to W. Bradley Wallace (VP) re: H.O. Records Management Program, USFG0111891.

[33] 3/16/1984 USF&G Administrative Services Circular No. 1-84 re: H.O. Records Management Program, USFG0653303.

[34] 3/19/1984 USF&G Interoffice Correspondence from Charles B. Watson (VP) to W. Bradley Wallace (VP) re: H.O. Records Management Program, USFG0111875.

[35] 7/17/1998 Randolph Rohrbaugh Dep. Tr. 2, 44, 79, USFG0620140.

[36] *Id.* at 44.

provide USF&G with possible defenses in response to claims of coverage, particularly in the context of long-tail claims.

- Kenneth Ford (USF&G In-House Counsel-Claim Legal Division) testified at deposition that USF&G decided to "stop the destruction" after policyholders began to prove coverage for the long-tail claims with "partial information concerning a policy," and the burden was shifted to the insurer to prove there wasn't a policy or at least to prove the policy terms, and USF&G was not able to rebut some of that information.[37]

- "Current instructions require retention of daily reports for at least three years plus current. Effective immediately, DO NOT destroy any daily report (monoline or package) which provides general liability insurance. Instructions for such disposition of such daily reports will be forthcoming. This change applies only to such daily reports and does not affect record retention programs applicable to other contents of underwriting files."[38] I know from my experience litigating bad faith claims that such daily reports, often referred to as "dailies," are generally considered evidence of coverage in California.

- March 1988 USF&G Interoffice Correspondence from H.O. Commercial Lines (William J. Flint, Asst. VP) to All Commercial Lines Superintendents re: Retention of Daily Reports. "This change in current RecordRetention procedures is necessary to accommodate the Claim Department's need to retrieve coverage evidence."[39] In explaining the scope of documents to be retained, this memorandum stated that "the following evidence relating to general liability must be included:

---

[37] 4/13/2000 Kenneth Ford Dep. Tr., STB09246-48, 61, 75 at 47-48.

[38] 3/21/1988 USF&G Memo from H.O. Commercial Lines Dept. (William J. Flint) to All Branch Offices, Except in Canada, Commercial Lines Superintendents re: Retention of Daily Reports, USFG0112065 (Among the records previously being destroyed as directed by the purge of 1984, the fact that USF&G decided to reverse course and cease the destruction of daily reports suggests that it was these very daily reports that established coverage that were being destroyed as a result of the 1984 purge. Indeed, the critical importance — to USF&G — of "daily reports" is underlined in response to interrogatory number 87, where USF&G pointed to the "general guidelines for confirming coverage" in a claims procedure manual. According to USF&G, "this manual recommended that claims handlers initially consult insurance contracts daily report for coverage information." 4/9/1999 Defendant USF&G's Responses to Western MacArthur Co.'s Seventh Set of Specially Prepared Interrogatories, USFG0009357-440, at USFG0009400 (USF&G's responses to Seventh Set of Specially Prepared Interrogatories dated April 9, 1999 at Interrogatory no. 87)).

[39] 3/28/1988 USF&G Memo re: Retention of Daily Reports, USFG0112077.

Case 1:19-cv-02992-LMM   Document 1-213/12-6   Filed 11/21/1906-6   Page 15 of 29   No. 604517/2002

RECEIVED NYSCEF: 02/21/2017

- ▪ Declarations

- ▪ Individual Coverage Declarations/Parts

- ▪ Manuscript Endorsements

- ▪ Endorsements Containing Typewritten Entries Other Than Attachment Clauses

- ▪ Endorsements Which Include Limits of Liability

- ▪ Endorsements Issued Subsequent to Policy Inception Date

- ▪ Notice of Cancellation/Termination"

- "At the conclusion of the meeting on March 21, . . . it was agreed that as an interim measure, daily reports providing general liability retention coverage would not be destroyed in accordance with current Records program."  Instead, they would be shipped in to Baltimore for storage.  You were to develop the necessary instructions for accomplishing this."[40]

- After reviewing the Master File Listing of policies along with Bob White, Mr. Ford advises that it is important to retain policies where there is the potential for "environmental/latent exposure claims," which have generally been understood to include asbestos claims:  Since Garage Liability policies cover Products Liability and "given the factthese insureds use solvents and petroleum products there is a potential for environmental/latent exposure claims"; therefore, they suggest that these policies be retained.[41]

- "In March, 1988 all Commercial Lines Superintendents received instructions to cease destruction of all daily reports coveringGeneral Liability.  This notice provides updated instructions on Commercial Lines General Liability and Garage Liability policy retention.  The change to the previous procedure is to ship Commercial Lines General Liability and

---

[40] 4/5/1988 Memo from H.O. Commercial Lines (William J. Flint (Asst. VP)) to H.O. Administrative Services (Donna E. Goodyear (Superintendent)) re: Retention of Daily Reports, USFG0112068.

[41] 4/21/1988 USF&G Interoffice Correspondence from H.O. Claim Management (Kenneth I. Ford, Asst. VP) to H.O. Commercial Lines (William Flint, Asst. VP) re: Destruction of Underwriting Files, USFG0112079-80 at USFG0112079.

Garage Liability policies to National Business Archives (NBA) for long term storage."[42]

- "Current record retention procedures have provided that policy information would be destroyed normally after three years.  However, the procedure outlined in the Temporary Notice will enable us to retain the coverage information indefinitely."  "Should your office bepresented with a claim where there is no current coverage information andfor which a policy was issued subsequent to January 1, 1985, the coverage information should be available in storage at the National Business Archives."[43]

USF&G's efforts in 1988, four years after the purge was conducted, to reverse direction and cease destruction of categories of documents such as daily reports covering general liability, only underscores the probability that documents evidencing coverage for Western Asbestos and other insureds were destroyed as a result of the 1984 purge.

## Western MacArthur Provides Yet Additional Evidence of an Insuring Relationship

On August 6, 1991 and August 15, 1991, Eugene Brown, Jr. with the law firm Hardin, Cook, which was now representing Western MacArthur, tendered the Joseph Vaiasicca, Mark Dickson, and Leslie Williams mesothelioma claims to USF&G on behalf of Western MacArthur.[44]  The attorneys working for Western MacArthur had

---

[42] 1/31/1989 USF&G Field Operations Dept. Temporary Notice #89-2 Commercial Lines General Liability and Garage Liability Policy Retention, USFG0112071.
[43] 3/10/1989 USF&G Memo from H.O. Claim Management (Kenneth I. Ford, Asst. VP) to All Branch Office Managers and Claim Superintendents re: Commercial Lines General Liability and Garage Liability Policy Retention-Field Operations Department Temporary Notice #89-2, USFG0112074.
[44] 8/6/91 Eugene Brown, Jr. (Hardin, Cook, representing Western MacArthur) Tender Letter to Lynn Westad (USF&G, San Jose), USFG0054167.  Mr. Brown tendered the Joseph Vaiasicca and Mark Dickson mesothelioma claims to USF&G and made the following points:

- In 1984, Western MacArthur was found to be the corporate successor-in-interest to the defunct Western Asbestos of San Francisco.
- Since that time, Western MacArthur has participated in the asbestos litigation as the successor to Western Asbestos and was potentially liable for the actions of Western Asbestos.
- PG&E had provided Hardin, Cook with copies of contracts reflecting work undertaken by Western Asbestos on behalf of PG&E, and the records clearly showed that USF&G provided general liability coverage to Western Asbestos.  Mr. Brown made specific reference to the enclosed copy of PG&E contract number 1-26-49, dated 2/18/49, and contract

**Appendix of Supporting Evidence to**
**Summary of Expert Conclusions**

1. **By The 1980's, USF&G Was Aware Of A Wave Of Asbestos Litigation Facing Its Insureds**

   - By the 1980's, it was public knowledge that companies engaged in asbestos products manufacture, installation, distribution, or sale faced an overwhelming number of claims from workers seeking damages for asbestos related injuries and death.

     o 04/22/80 "Asbestos Liability Worries Insurers," The New York Times.

        ▪ "Faced with a rising number of lawsuits against manufacturers for asbestos-related diseases, insurance companies are bracing for what may be the most costly liability settlements in the history of their industry."

        ▪ "[T]he Asbestos Litigation Reporter, estimates that more than 6,000 product liability suits are now pending."

     o 08/03/80 "Courts Flooded with Asbestos Litigation," The New York Times.

        ▪ "Thousands of shipyard, insulation, construction and auto partsworkers who handled asbestos during the 1950's are flooding the FederalCourts in New Jersey with damage suits against their former employers, insurance companies and mining companies."

        ▪ "They seek, and, in some states, receive, millions of dollars in compensation for ailments ranging from club feet and cancer to lung-damaging asbestosis, all allegedly caused by the asbestos they handled."

        ▪ "'The courts are tremendously bogged down across the country,' said [the] editor of the Asbestos Litigation Reporter . . . . 'In most instances, new cases are piling up faster than the old cases are being resolved. A lot of this is because of recent publicity about the hazards of asbestos.'"

     o 10/02/81 "Asbestos Death Insurance Claims Upheld," Washington Post.
        "The U.S. Court of Appeals yesterday put the burden on insurance companies to pay the entire cost of damage claims brought by workers exposed to asbestos, even though those insurance policies may have expired by the time the workers became ill and filed lawsuits."

     o 10/02/81 "Product-Liability Insurer's Risks Mount in Wake of Reeling," The Wall Street Journal.

        ▪ "A ruling by the Federal Appeals Court in Washington appears toexpose insurance companies to increased liability in damage suits against manufacturers of hazardous products."

1

Case 1:02-cv-02960-JMW Document 1213/15 Filed 11/2/15 Filing Number 10-6 Page 18 of 29

## Appendix of Supporting Evidence to
## Summary of Expert Conclusions

- ▪ "Rulings like the latest one would 'drive insurance companies to the brink of ruin,' and ultimately, make insurance 'unavailable or unfavorable.'"

- o <u>12/30/81 "Report Paints Grim Picture of Asbestos," Washington Post.</u>

  - ▪ "More than 200,000 of the 9 million surviving workers who have been exposed to asbestos during the past 40 years will die of asbestos-associated cancer by the end of the century, an internal Department of Labor report concludes."

  - ▪ "The increase in litigation also could hurt the financial stability of many insurance companies that end up paying the monetary damages, the report says."

- o <u>04/27/82 "The Asbestos Mess," Washington Post</u>.

  - ▪ "Occupational exposure to asbestos, which is now known to cause disability and death … has created a legal nightmare."

  - ▪ "[T]he number of victims is so large—it is expected soon to reach 8,000 to 10,000 a year and to remain at that level until the end of the century…."

  - ▪ "[T]he legal system is now awash in a flood of claims and cases. Workers are suing manufacturers; the manufacturers are suing their insurance companies; and the insurance companies are suing each other."

- o <u>06/14/82 "Insurers Looking to Courts to Settle Asbestos Claims," The Wall Street Journal</u>.

  - ▪ "Billions of dollars will be paid to settle claims brought by or on behalf of workers exposed to the mineral. The issue is who will pay."

  - ▪ "Some 16,000 damage suits have already been filed against these companies, and new cases are piling up at the rate of more than 450 a month. A few experts contend that some insurers could collapse under the weight of asbestos claims."

- o <u>08/10/82 "Asbestos Now Company Peril," The New York Times</u>.
  "The Asbestos Litigation Reporter, a newsletter, estimated that there are about 13,500 suits on behalf of up to 30,000 people claiming that exposure to asbestos had produced serious lung problems."

- o <u>02/10/84 Mealey's Litigation Reports: Asbestos (First Issue) includes article "The 'Asbestos Epidemic'—An Overview."</u>

  - ▪ "A number of prominent members of the plaintiff and defense bars and the insurance industry have agreed to be among contributors."

2

Case 19-cv-22260-JJM    Document 51-213/165    Filed 5/19/17    Page 19 of 29. 604517/2002

### Appendix of Supporting Evidence to
### Summary of Expert Conclusions

- ▪ "We are faced with an epidemic of such enormous proportions that one highly renowned medical authority has labeled it the greatest epidemic of a single disease in the history of mankind."

- ▪ "Estimates of the current volume of outstanding suits vary from 20,000 to 30,000."

- ▪ The long range forecast of Dr. Irving Selikoff and William Nicholson that spans into the next century "places the number of expected victims of asbestos related disease well over 200,000."

- The multitude of these claims and the amount of money at stake were a very real threat to the above businesses forcing some large asbestos companies into bankruptcy such as UNR Industries and Manville Corporation in 1982.

  - o <u>08/10/82 "Asbestos Now Company Peril," The New York Times</u>.

    - ▪ "Last week, the Manville Corporation, the largest asbestos producer in the country, omitted its quarterly dividend, and admitted for the first time that the continuing flood of asbestos litigation, which cost it $8.6 million in the first half of the year, was imperiling its financial health."

    - ▪ "A week before Manville's announcement, the Chicago-based UNR Industries filed for protection from its creditors under Chapter 11 . . . citing 17,000 claims against it related to asbestos pipe insulation it has not made since 1962.  Since the beginning of 1980, the company has spent more than $26 million on asbestos litigation."

  - o <u>08/26/84 "Asbestos: Manville Bankruptcy, Damage Cases Still Intertwined and Still Unresolved," Washington Post</u>.

    - ▪ "Two years ago, Manville Corp. filed for protection under Chapter 11 of the federal Bankruptcy Code, saying its existence was threatened by a rising tide of damage suits by asbestos workers and their families."

    - ▪ "The claims totaled 16,500 two years ago and were rising at the rate of 400 to 500 a month.  When Manville's lawyers filed for bankruptcy, they predicted then that, if no relief were granted, the company would sink under the weight of $2 billion worth of liability in asbestos-related lawsuits.  The company since has raised that projected figure to $4.8 billion."

    - ▪ "After two years, there is still no end in sight . . . ."

    - ▪ UNR, which no longer makes asbestos products, filed under Chapter 11 in July 1982 and Amatex filed in November 1982.

Case 1:19-cv-02960-JMF   Document 51-213/15   Filed 05/13/17   Page 20 of 29

## Appendix of Supporting Evidence to
## Summary of Expert Conclusions

- o  <u>August 2001 Mealey's Asbestos Bankruptcy Report</u>.

    - ▪  UNR faced approximately 17,000 asbestos claims and anticipated 120,000 before filing for bankruptcy protection.

    - ▪  By 1988, the Manville Trust was expected to receive between 83,000-100,000 asbestos claims over the expected 49-year life of the trust.

- •  By the 1980's, the insurance industry including USF&G was aware of this wave of asbestos litigation facing its insureds.

    - o  <u>01/00/82 "The Economic Consequences of Asbestos-Related Disease," by Paul W. MacAvoy, in association with J. Karr and P. Wilson, Yale School of Organization and Management.[1]</u>

        - ▪  "As a result of exposure to asbestos and the occurrence of these diseases, workers or their survivors are being awarded compensation by the courts in product liability suits far in excess of amounts previously paid to the victim as workers' compensation for disability." (pg. 1)

        - ▪  "The bulk of such payments would probably not come from companies in the asbestos and construction industries, but rather from the financial resources of the casualty and property insurance companies thatinsured the manufacturing companies." (pg. 2)

        - ▪  "Such payments and related expenses could become so large as toaffect the performance of these insurance companies.  The pool of resources to cover losses would be so depleted as to reduce coverage provided to the rest of the economy.  Even if the insurance industry were not impaired in its operating functions, certain firms could be so adversely affected as to cause changes in market structure and less direct but nonetheless potentially important changes in economic performance." (pg. 2)

        - ▪  "The large payments that will result from asbestos product liability suits are likely to go beyond the financial capacity of the insurance industry to meet them as well as their other obligations." (pg. 85)

        - ▪  " While the many variables that affect future liabilities cannot be determined with certainty, the best estimate of the present value of future payments of $38.2 billion represents almost, if not completely, all of the relevant insurance industry assets at the present time." (pg. 85)

---

[1] Financial support for data collection and analysis was provided by Commercial Union Insurance Company.

4

Case 19-cv-2290-JMM   Date Filed 11/13/15   Entry Number 40-6   Page 21 of 29

## Appendix of Supporting Evidence to
## Summary of Expert Conclusions

- "Given this condition, a policy which allows the continuance of the present system of asbestos claims compensation will result in a number of insurance company and perhaps asbestos company bankruptcies." (pg. 85)

- 1983 "Costs of Asbestos Litigation" by James S. Kakalik, et al. (Research supported by The Institute for Civil Justice) published by The Rand Corporation)[2].

  - "The resolution of disputes regarding asbestos-related diseases has become one of the critical problems facing the American civil justice system." (pg. iii)

  - "Exposure to asbestos and consequent litigation involve potentially enormous personal and economic stakes: Approximately 24,000 people had filed product liability lawsuits claiming asbestos-related injury as of March 1983. Many times that number have been exposed to asbestos, and the potential liability of the defendant firms may run into the billions of dollars." (pg. v)

  - "About $1 billion in compensation and litigation expenses was spent on asbestos product liability litigation from the early 1970s, when the first claims were closed, through the end of 1982; of that total, about one-third has been provided by defendants and two-thirds by insurers." (pg. v)

  - "The investment firm of Conning & Company has estimated that the insurance industry's ultimate liability for asbestos claims will be in the $4 to $10 billion range. The firm estimates the total number of claims filed by the year 2010 will be in the range of 83,000 to 178,000, which means at least 59,000 new claims above the 24,000 filed as of March 1983." (pg. 10)

  - "The basic uncertainty over insurance coverage has severely complicated relations between defendants and insurers, and has itself spawned a large number of lawsuits." (pg. 4)

- 05/08/02 Mark Peterson (Western MacArthur Expert) Trial Testimony. Mr. Peterson testified that

  - "…[F]rom personal experience I know that [insurers] were aware of and concerned about these [growing asbestos] liabilities as early as 1981 and 1982 when I had conversations with insurance company representatives at RAND and other places." (4169:22-4170:2)

---

[2] Seventeen major defendants as well as 12 major insurers contributed data to this report.

Case 1:04-cv-02966-LAK-HBP Document 150-6 Filed 11/13/15 Page 22 of 29

## Appendix of Supporting Evidence to
## Summary of Expert Conclusions

- ▪ "[USF&G] were one of the companies that provided money to RAND to do the research that I was doing, that other people that—were doing at the time. And so they—they participated in—supporting the work andwere kept up to speed, kept up to date as to what we were doing." (4170:3-12)

- ▪ "Any—any company or individual that contributed money that wentto support the research was given copies of all of the publications and work, and they were invited to attend briefings where the work was described and discussed. So they [USF&G], like any contributor, would have had it directly." (4170:18-22)

- ▪ The MacAvoy study was widely disseminated to persons interestedin asbestos litigation including insurance companies. (4171:21-4172:15)

- ▪ The Conning Company study published in 1982 or 1983 was widely disseminated to the insurance industry. (4172:16-4173:9)

- o 11/28/83 Digest of Minutes Insurance Services Office General Liability Committee Meeting of November 2-3, 1983. [USFG0129897-36] W. Flint of USF&G was present at the meeting. "[Defense] costs in connection with the existing asbestos and other similar toxic tort latent injury litigation are resulting in astronomical amounts being spent." [USFG0129915]

- o 12/06/85 USF&G Administrative Services Circular No. 5-85 re Claim Department Guidelines for Claims Involving Toxic or Hazardous Waste Substances. "Bodily injury claims involving toxic or hazardoussubstances are on the increase." [USFG0650587-93]

- o 10/20/88 USF&G Commercial Lines Circular No. 4-88 re Asbestos. "The legal climate surrounding asbestos liability could not be more uncertain. The insurance industry had by 1982 paid out over $1 billion for damages and expenses on about 30,000 asbestos claims, most of which involved injury to shipyard and factory workers exposed to asbestos in the workplace. Future estimates run from $4 to $87 billion and 180,000 additional claims by the turn of the century. The courts have recognized the right of injured workers to bring suit against non-employer defendants, e.g. mining companies, manufacturers, etc." [USFG0103944-55 at USFG0103948]

- • USF&G, which insured Western Asbestos for this type of loss, was very concerned about covering these kinds of claims and the threat to its own profits.

- o 1984 USF&G Annual Report: "A Message From The Chairman." "DearFellow Employees: The year 1984 is now history and there is nothing any of us can do to change those things that had severe impacts on the results of our company. Nineteen eighty-four, the worst year in the history of the Company

INDEX NO. 604517/2002
RECEIVED NYSCEF: 02/21/2017

**Appendix of Supporting Evidence to
Summary of Expert Conclusions**

in underwriting results, was also the sixth year of consecutive declines in those underwriting results." [USFG0052549-51]

- o 1985 USF&G Annual Report: "A Message From The Chairman and President." "One of the contributing factors to our unfavorable underwriting results in recent times has been the unpredictability of the civil justicesystem." [USFG0052553-56]

- o 10/20/88 USF&G Commercial Lines Circular No. 4-88 re Asbestos. "The legal climate surrounding asbestos liability could not be more uncertain." [USFG0103944-55 at USFG0103948]

2. **In 1982, Western MacArthur Hired An Investigator To Research Western Asbestos' Coverage With USF&G**

- 12/27/82 Thad Eaton (Insurance Adjuster for Hardin, Cook representing Western MacArthur) Letter to Richard Thompson (USF&G Branch Manager, San Jose). In 1982, facing asbestos lawsuits against itself, Western MacArthur hired an investigator, Thad Eaton, to investigate coverage that it had – either directly or through its acquisition of Western Asbestos – during and prior to the 1960's. Western MacArthur had information that USF&G had issued liability insurance policies to Western Asbestos during some period of time. [USFG0054088-90][3]

- On December 22, 1982, Mr. Eaton contacted Richard Thompson, manager of USF&G's San Jose office, by telephone and asked that USF&G search its records for any evidence of coverage for Western Asbestos. [USFG0054088-90]

- On December 27, 1982, Mr. Eaton repeated that request by letter. Advising Mr. Thompson that he was acting on behalf of Western MacArthur Company, formerly Western Asbestos, Mr. Eaton wrote that he had learned that Herb Stockton, an agent in San Francisco, and the Willson and Loustau Company in San Francisco both had written liability insurance for Western Asbestos through USF&G. Mr. Eaton further advised Mr. Thompson that others at Western Asbestos had corroborated that "a good deal" of Western Asbestos' insurance was written through USF&G. Mr. Eaton volunteered to "provide resources to

---

[3] 12/27/82 Thad Eaton (Eaton & Johnson) Letter to Bruce McLeod (Hardin, Cook). Mr. Eaton recounted his efforts tracking down evidence of liability coverage for Western Asbestos. He had made contact with various brokers including Robert Jones at Jones-Horne; Hal Dean Willson; Laurent Loustau; and Judd Conway, VP General Accident, and Joseph Kelly, former Secretary of Western Asbestos Board of Directors. Mr. Eaton stated that "[a]ll contacts have been consistent in the information provided. It is evident that General Accident Insurance Company wrote the liability insurance for Western Asbestos Company during the mid to late 1960's, and [USF&G] wrote the policy prior to this time."[USFG0002987-3000 and USFG0650841]

Case 1:02-cv-02280-HAW Document 14-15 Filed 05/13/15 Page 24 of 29 PageID 10-6 Page 24 of 29

## Appendix of Supporting Evidence to
## Summary of Expert Conclusions

conduct a thorough records check if there is any way we could be of assistance in this regard." [USFG0054088-90]

- **01/06/83 Richard Thompson (USF&G Branch Manager, San Jose) Letter to Thad Eaton (Eaton & Johnson)**. Mr. Thompson advised Mr. Eaton in a two-sentence response, that "[b]ecause of space and management considerations, our Company does not keep any records beyond the period required by law. The period of time you refer to is far beyond that period and we have no records for the time you mentioned in your letter." [USFG0025753]

- **05/03/96 Richard Thompson (USF&G Branch Manager, San Jose) Deposition Testimony**. Moreover, Mr. Thompson has since admitted in deposition that he has no recollection of ever checking to see whether USF&G actually had records before he wrote his response to Western MacArthur on January 6, 1983. (66:18-26)

3. **In 1983, Western Asbestos Tendered The Defense Of Claims To USF&G**

- **05/05/83 Joseph Kelly (Former Secretary of Western Asbestos Board of Directors) Tender Letter to USF&G Home Office Claims Manager**. Mr. Kelly formally tendered the defense of Western Asbestos to USF&G "in all cases where Western Asbestos has been named directly as a defendant and in all cases where allegations are being made that Western Asbestos was the predecessor-in-interest to Western MacArthur Company." Mr. Kelly informed USF&G that the claims arose from individuals' exposure to asbestos-containing products alleged to have occurred between 1940 and the present. [USFG0163509-10][4]

- Mr. Kelly stated that it was his understanding that USF&G wroteliability insurance for Western Asbestos prior to the mid-1960's. Mr. Kelly advised USF&G that Western Asbestos' insurance account had been handled by Herbert Stockton, then by Willson & Loustau, and finally by Jones-Horne Insurance Brokers all located in San Francisco, and that key employees at Western Asbestos, namely Lydia Noblie, and Roger Whitmeir – who maintained the insurance records at Western Asbestos – confirmed that it was USF&G that had written policies to Western Asbestos. [USFG0163509-10][5]

---

[4] 04/26/96 Clyde Rhodes (Western MacArthur, Director) Deposition Testimony. Mr. Rhodes testified that Mr. tendered the "cases in hand." (551:7-554:17)

[5] On February 29, 1984, Joseph Kelly testified that it was his recollection that USF&G insured Western Asbestos for P.L. and P.D. up until 1960 and that Herbert Stockton handled that insurance for Western Asbestos. (25:5-26:20)

## Appendix of Supporting Evidence to
## Summary of Expert Conclusions

- <u>11/17/95 Robert Kostecki (USF&G Director of Long-Term Exposure Claims Group) Deposition Testimony</u>.  USF&G never responded to Mr. Kelly's tender.  Mr. Kostecki, USF&G's Designated Person Most Knowledgeable for Deposition, later testified in deposition that USF&G had not been able to locate a copy of the Kelly letter in its files nor any response to it from USF&G. (166:2-26)

- <u>03/06/01 John Purcell (Western Asbestos President and Director)Deposition Testimony</u>.  Mr. Purcell testified that it was his belief that the May 5, 1983 tender letter was sent to USF&G.  A similar tender letter was simultaneously sent to another Western Asbestos insurer, General Accident, to which General Accident responded, which would tend to support the conclusion that the letter was forwarded to USF&G as well.[6] [USFG416682-84, USFG416687-94, USFG416694 and 03/06/01 John Purcell Deposition Testimony (457:1-460:20)]

4. **<u>Beginning In 1984, USF&G Destroyed Evidence Of Coverage In Order To Protect Itself From Liability</u>**

- <u>August 1960 USF&G Brochure "The Electronics Program of USF&G.</u>"  USF&G had a records preservation program in place no later than 1955 thatincluded microfilming of old records. [USFG0052498-516] That program took a new direction in 1984.

- <u>03/14/84 USF&G (Karl H. Doerre, Executive VP) Interoffice Correspondence to All Department Heads Only re Implementation of a Records Retention Program</u>. "It will be necessary that each department head and the key people in your department take the time to purge your files of unneeded material." [USFG0152090-91]

- <u>03/16/84 USF&G Administrative Services Circular No. 1-84 re H.O. Records Management Program</u>.  "The Administrative Services Department has been directed by the Executive Department to establish a USF&G Records Management Program." "All existing departmental files are to be in full compliance . . . , including having been completely purged of all obsolete and duplicate material." [USFG0653303-5]

- <u>03/19/84 USF&G Interoffice Correspondence from Charles B. Watson (VP) to W. Bradley Wallace (VP) re H.O. Records Management Program.</u>  "The program has been clearly outlined, and is to be completed <u>no later than</u> May 15, 1984." [USFG0111875]

- <u>04/03/84 USF&G Interoffice Correspondence from H.O. Treasury Operations (A.J. Richardson) to Retention Committee re Meeting on Retention Program</u>.  Twice

---

[6] Also see January 30, 1996 deposition testimony of Bruce McLeod (Hardin, Cook) supporting the fact that the May 5, 1983 tender letter was sent to USF&G. (135:1-25)

Case 1:02-cv-02960-... Document 513-6 ... Page 26 of 29

### Appendix of Supporting Evidence to
### Summary of Expert Conclusions

yearly, USF&G's Retention Committee must provide a report on the number of file cabinets in use. [USFG630010]

- 04/30/84 USF&G Interoffice Correspondence from Charles B. Watson (VP) to H.O. Casualty (W. Bradley Wallace, VP) re H.O. Records Management Program. As stated by USF&G Vice President Watson, the new document destruction policy mandated the "purging of each file, not just files that can be discarded in entirety," mandated that doubts be resolved "in favor of discarding unless there are legal restraints," and admonished that "we must be absolutely sure that we have thoroughly cleaned existing files." [USFG0111891-92]

- 05/15/84 H.O. Records Retention Manual. [USFG630388-450 at USFG630448]

- 07/17/98 Randolph Rohrbaugh (USF&G VP Quality Assurance) Deposition Testimony. Mr. Rohrbaugh testified that at a meeting among USF&G management and attorneys in 1984, there was a discussion as to whether USF&G should retain in its records information about insureds' policies given that insureds would bear the burden of proof as to those policies. (60:1-70:24 and 102:23-103:11)

5. **In 1987, USF&G Hired An Archivist To Collect Historical Records Of The Company Including Policy Records**

- 05/18/00 Carolyn Maynard (USF&G Archivist) Deposition Testimony. In 1987, USF&G hired an archivist, Carolyn Maynard, to augment its existing archive of historical company records with an eye toward compiling materials for the upcoming centennial celebration of USF&G in 1996. During her tenure at USF&G (1987-1989 and 1993-1996), Ms. Maynard collected documents, objects and photographs. (15:18-24, 16:1-16, 21:12-22:4, 23:3-25:5 and 41:9-20)

- In addition to reviewing the already existing archival material, which consisted of approximately ten boxes, Ms. Maynard recalled sifting through boxes of documents in a storage room in the basement of USF&G's corporate communications department at its Home Office. The contents of these boxes included policy ledgers containing listings of USF&G's policyholders and policy numbers, and a variety of other documents, including old photographs, newsletters, and advertisements. She recalled having seen a number of policies in these boxes, dating as far back as 1910. (16:1-23:2)

- Ms. Maynard also visited a storage building located off Pratt Street and Eutaw. There were aisles of documents, stacked approximately 3 feet, 4 feet high. She saw "lots of ledgers." There were at least 3 stacks of policy ledgers, each about 5 feet tall. She removed at least four or five ledgers to potentially include in her centennial display. (25:12-27:24 and 42:4-22)

10

Case 1:02-cv-02960-HM   Date Filed 11/13/15   Entry Number 10-6   Page 27 of 29

### Appendix of Supporting Evidence to
### Summary of Expert Conclusions

- Ms. Maynard organized these ledgers, along with the other documents she collected for the archives, in chronological order and stored them in acid-free boxes. She testified that her collection was still in existence at USF&G sometime between 1993 to 1996. [7] (21:12-18, 37:2-10 and 42:23-43:4)

- Once Western MacArthur learned of these ledgers mentioned by Carolyn Maynard at her May 18, 2000 deposition, it requested that USF&G produce them. In a letter dated October 4, 2000, Sheila Cuthbert (Keker & VanNest, representing USF&G) reported to Western MacArthur "I reiterate that USF&G is still in the process of trying to locate ledgers that may have existed. The storage room on Pratt Street no longer exists." [USFG002972-3] In a follow-up letter dated October 6, 2000, Ms. Cuthbert stated, "USF&G has been and is still diligently searching for where the ledgers might be located currently." [USFG0133124-27]

- In response to Ms. Cuthbert, David Halbreich (Brobeck, representing Western MacArthur) wrote on October 10, 2000, "The ledgers did not get up and walk out the front door of the USF&G's offices. Certainly, if the ledgers contained information that was helpful to USF&G's position in this litigation, then the ledgers no doubt would have been found. That the ledgers remain 'missing' speaks volumes."[8][USFG0028241-42]

6. **In 1988, USF&G Modified Its Records Destruction Program Once It Believed Retention of Certain Documentation Was To Its Own Advantage**

- <u>04/13/00 Kenneth Ford (USF&G In-House Counsel-Claim Legal Division) Deposition Testimony.</u> Mr. Ford testified that USF&G decided to "stop the destruction" after policyholders began to prove coverage for the long-tail claims with "partial information concerning a policy," and the burden was shifted to the insurer to prove there wasn't a policy or at least to prove the policy terms, and USF&G was not able to rebut some of that information. (37:21-18, 39:17-41:6, 74:9-6 and 107:24-108:15)

- <u>12/06/85 USF&G Administrative Services Circular No. 5.85 re Claim Department Guidelines for Claims Involving Toxic or Hazardous Waste Substances (signed by</u>

---

[7] Sharon Dissinger (USF&G In-House Counsel) testified that she found out about Carolyn Maynard's collection in November 1995. (5501:17-28)

[8] The stacks of ledgers were never produced. USF&G did locate two ledgers that were made available for inspection in 2000. [10/04/00 Cuthbert Letter to Rawles USFG0024972-73, 10/06/00 Cuthbert Letter to Halbreich USFG0133124-7 and 04/22/01 Western MacArthur Opposition to USF&G Motion for Summary Adjudication of Western MacArthur Bad Faith Claims USFG0163235-85 (pgs. 18-19)]

## Appendix of Supporting Evidence to
## Summary of Expert Conclusions

Ronald Wohlust). [USFG0650587-93] USF&G had explicit internal rules of what it was required to do when a "lost" policy was asserted:

o   "When a claim is asserted under a policy, the insurer has an obligation to conduct a thorough search of available records to confirm the existence of the alleged policy. On old, expired policies, it is therefore not enough, in our opinion, to determine that the underwriting records have been destroyed when an insured, agent or an attorney continue to allege that a policy or policies did exist at one time and can offer proof of same."

o   "All records, documents, cancelled checks, correspondence, bookkeeping entries, etc. that are alleged to serve as proof of the existence of a policy should be obtained, examined and evaluated."

- 03/21/88 USF&G Interoffice Correspondence from H.O. Commercial Lines Dept. (William J. Flint) to All Branch Offices, Except in Canada, Commercial Lines Superintendents re Retention of Daily Reports. "Current instructions require retention of daily reports for at least three years plus current. Effective immediately, DO NOT destroy any daily report (monoline or package) which provides general liability insurance. Instructions for such disposition of such daily reports will be forthcoming. This change applies only to such daily reports and does not affect record retention programs applicable to other contents of underwriting files." [USFG0112065 and 04/06/99 William Flint Deposition Testimony (73:3-78:15)]

- 03/28/88 USF&G Interoffice Correspondence from H.O. Commercial Lines (William J. Flint, Asst. VP) to All Commercial Lines Superintendents re Retention of Daily Reports. [USFG0112077 and 04/06/99 William Flint Deposition Testimony (73:3-78:15)] Mr. Flint refers to his letter of March 21, 1988 notifying recipients "that effective immediately daily reports (monoline or any package) providing general liability insurance are NOT to be destroyed. This change in current Record Retention procedures is necessary to accommodate the Claim Department's need to retrieve coverage evidence."

   "[T]he following evidence relating to general liability must be included:

   Declarations
   Individual Coverage Declarations/Parts
   Manuscript Endorsements
   Endorsements Containing Typewritten Entries Other Than Attachment Clauses
   Endorsements Which Include Limits of Liability
   Endorsements Issued Subsequent to Policy Inception Date
   Notice of Cancellation/Termination"

12

### Appendix of Supporting Evidence to
### Summary of Expert Conclusions

- <u>04/05/88 USF&G Interoffice Correspondence from H.O. Commercial Lines (William J. Flint, Asst. VP) to H.O. Administrative Services (Donna E. Goodyear (Superintendent) re Retention of Daily Reports</u>.  "At the conclusion of the meeting on March 21, . . . it was agreed that as an interim measure, daily reports providing general liability coverage would not be destroyed in accordance with current Records Retention program." "Instead, they would be shipped in to Baltimore for storage.  You were to develop the necessary instructions for accomplishing this." [USFG0112068 and 04/06/99 William Flint Deposition Testimony (73:3-78:15)]

- <u>04/21/88 USF&G Interoffice Correspondence from H.O. Claim Management (Kenneth I. Ford, Asst. VP) to H.O. Commercial Lines (William Flint, Asst. VP) re Destruction of Underwriting Files</u>.  After reviewing the Master File Listing of policies along with Bob White, Mr. Ford reported their comments:  Since Garage Liability policies cover Products Liability and "given the fact these insureds use solvents and petroleum products there is a potential for environmental/latent exposure claims"; therefore, they suggested that these policies be retained.  Mr. Ford also listed "the prefixes of policies" that he believed ought to be retained. [USFG0112079-80]

- <u>01/31/89 USF&G Field Operations Dept. Temporary Notice #89-2 re Commercial Lines General Liability and Garage Liability Policy Retention</u>.  "In March, 1988 all Commercial Lines Superintendents received instructions to cease destruction of all daily reports covering General Liability.  This notice provides updated instructions on Commercial Lines General Liability and Garage Liability policy retention.  The change to the previous procedure is to ship Commercial Lines General Liability and Garage Liability policies to National Business Archives (NBA) for long term storage." [USFG0112071-73]

- <u>03/10/89 USF&G Memo from H.O. Claim Management (Kenneth I. Ford, Asst. VP to All Branch Office Managers and Claim Superintendents re Commercial Lines General Liability and Garage Liability Policy Retention-Field Operations Department Temporary Notice #89-2</u>.  "Current record retention procedures have provided that policy information would be destroyed normally after three years.  However, the procedure outlined in the Temporary Notice will enable us to retain the coverage information indefinitely." "Should your office be presented with a claim where there is no current coverage information and for which a policy was issued subsequent to January 1, 1985, the coverage information should be available in storage at the National Business Archives." [USFG0112074]

- <u>09/00/90 USF&G "Claim Procedures Manual."</u>  **In order "[t]o confirm coverage, it is necessary to look at the policy/bond or a copy of it**" (Rev. 11/85).  The manual listed sources where one could locate the policy/bond including Daily Reports, the producing agent, and the insured/obligee. "On commercial insured

13