IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| United States Fidelity and<br>Guaranty Company, | ) August 4, 2020<br>)<br>) |
| Plaintiff, | ) Greenville, SC<br>)<br>) |
| vs. | )<br>) |
| Southern Insulation Inc, | ) 6:19cv02980<br>) |
| Defendant. | ) |

TRANSCRIPT OF MOTION TO COMPEL

BEFORE THE HONORABLE HENRY M. HERLONG JR.
United States District Judge, presiding

A P P E A R A N C E S:

For Plaintiff:              William P. Davis, Esquire
                            Baker Ravenel and Bender
                            P.O. Box 8057
                            Greenville, SC 29202

                            Harry Lee, Esquire
                            Steptoe and Johnson
                            1330 Connecticut Avenue NW
                            Washington, DC 20036

For Defendant:              John Belton White Jr., Esquire
                            Harrison White Smith and Coggins
                            P.O. Box 3547
                            Spartanburg, SC 29304

                            Brady Sherrod Edwards, Esquire
                            Morgan Lewis and Bockius LLP
                            100 Louisiana, Suite 4000
                            Houston, TX 77002

Teresa B. Johnson, CVR-M-CM, RVR, RVR-M
U.S. District Court Reporter
300 E. Washington Street, Room 304
Greenville, S.C. 29601

2

<u>P R O C E E D I N G S</u>

1

2        (Court is called to order on Tuesday, August 04, 2020 at

3    10:40 a.m.)

4            **THE COURT:**  Thank you. Be seated please.

5            **THE CLERK:**  And please mute your mic when you're not

6    speaking because we're getting feedback.

7            **THE COURT:**  For the attorneys who are present in the

8    courtroom, if you wish to do so, when you talk, you can remove

9    your mask because you are separated.

10           In this matter, the defendants, I believe, have

11   motions to compel. And I'll hear from the defendant at this

12   time.

13           **MR. WHITE:**  Your Honor, may it please the Court. John

14   White of Harrison White on behalf of the defendants. On the

15   screen, Your Honor, to the far left, the gentleman with the

16   blue suit and blue tie, is named Brady Edwards. He's with

17   Morgan Lewis. He's from Texas. He's our cocounsel, and he will

18   be arguing this motion to compel this morning.

19           To my immediate left is Peter Protopapas. He's the

20   receiver for Southern Insulation. And more importantly, to my

21   rear is Marghretta Shisko, who is my partner, and as the Court

22   knows, she enables me to do what I do. So we're here on behalf

23   of the Southern Insulation. We're glad to see that you are well

24   and your staff, and appreciate the opportunity this morning to

25   argue this, which we consider a very important motion.

1          **THE COURT:**  Well, before I hear argument, I will let

2    the plaintiff identify themselves.

3          **MR. DAVIS:**  Good morning, Your Honor. William Davis

4    with Baker Ravenel and Bender, here for USF&G. And Harry Lee of

5    the Steptoe firm in Washington DC is appearing by video and

6    will be responding.

7          **MR. LEE:**  Good morning.

8          **THE COURT:**  Good morning.

9          **THE CLERK:**  Be sure to speak into the mic when you

10   speak. Thank you.

11          **THE COURT:**  Mr. Edwards, I'll hear from you.

12          **MR. EDWARDS:**  Thank you, Your Honor. And thank you

13   for having us and accommodating us by video this morning. The

14   parties come to you very early in this case, but with a great

15   deal of history between us from other similar matters. And as a

16   result of that, Mr. White thought it might be helpful if I gave

17   some background as to what brought us here and the -- the

18   nature of the dispute before us today.

19          In recent years, the South Carolina asbestos

20   litigation has become extremely active. And as a result of

21   that, the South Carolina Supreme Court has appointed retired

22   Chief Justice Jean Toal to oversee all of the asbestos

23   litigation in South Carolina. As part of her duties, Chief

24   Justice Toal has on occasion appointed Mr. Protopapas as the

25   receiver for defunct companies that have been sued in the South

1    Carolina asbestos litigation.

2         In that capacity, Mr. Protopapas is responsible for,

3    really, two jobs for these defunct companies: the first is to

4    marshal the assets of these companies, which are generally

5    insurance policies and rights under insurance policies; and a

6    second part of his job is to administer the defense of the

7    asbestos cases that are filed against these defunct entities.

8         To date, Chief Justice Toal has appointed

9    Mr. Protopapas in three such receiverships. In the first

10   receivership, the parties -- the company there was called

11   Covil, C-o-v-i-l. Mr. Protopapas, on behalf of the company and

12   USF&G, have had lengthy and hotly-contested insurance coverage

13   litigation whereas Mr. Protopapas has been seeking to

14   understand, investigate, and identify the scope of the

15   insurance available for Covil in that case.

16        After two years of litigation with USF&G, where I

17   believe Mr. Davis there in the courtroom served as USF&G's

18   counsel, Chief Justice Toal concluded that USF&G had not been

19   forthright and candid with the Court in that process, and made

20   findings based upon the evidence that had been discovered in

21   that case and USF&G's behavior, that two years of coverage

22   which had been identified when we started was actually 12 years

23   of coverage. And Chief -- Chief Justice Toal made a number of

24   findings about why that coverage had been so difficult to

25   discover, including findings related to USF&G's corporate

1  policy of, quote, purging, closed quote, its documents to put

2  policyholders, like Southern Insulation here, in this laundry

3  of needing coverage that it purchased years ago for asbestos

4  cases filed today, but not being able to locate it because it

5  had been destroyed. That's the situation that we find ourselves

6  in today.

7          Southern Insulation was formed in 1967 and later

8  dissolved in 1991. Mr. Protopapas was appointed as receiver

9  almost 30 years later and, upon his appointment, set out to

10 marshal the assets, identify the insurance policies, and

11 administer the defense of the asbestos litigation in South

12 Carolina. As part of his investigation into the policies

13 available to Southern, Mr. Protopapas discovered two

14 certificates of insurance issued by USF&G, which is now part

15 of Travelers. These certificates of insurance reflect a policy

16 of coverage from 1967 to 1968. And in according USF&G's own

17 documents, in the absence of an insurance policy itself

18 certificate of insurance of this sort is to be treated as the

19 policy.

20          **THE COURT:**  Say that again --

21          **MR. EDWARDS:**  As such -- pardon me?

22          **THE COURT:**  Say that again.

23          **MR. EDWARDS:**  Yes, sir.  Mr. Protopapas identified

24 two certificates of insurance --

25          **THE COURT:**  I got that. What I wanted you to repeat

1    was, I thought you said that pursuant to USF&G's policy, they

2    treat certificates of insurance -- what?

3         **MR. EDWARDS:**  Yes, sir. According to USF&G's own

4    documents, a certificate of insurance is, quote, a statement of

5    coverage taking place -- the place of the policy as evidence of

6    insurance.

7         **THE COURT:**  What do you mean when you say "pursuant

8    to that policy"?  You're saying they've got some written

9    policy?

10         **MR. EDWARDS:**  No, Your Honor. In documents that we

11    obtained from USF&G in the Covil case that I mentioned, we have

12    a handbook from the Education Department of USF&G, which

13    describes insurance as, quote, a statement of coverage taking

14    the place of the policy as evidence of insurance ---

15         **THE COURT:**  Okay.

16         **MR. EDWARDS:** --- close quote. So with those

17    certificates of insurance at hand and our knowledge of how

18    USF&G internally has said it would treat those policies --

19    those certificates as policies, Mr. Protopapas began to tender

20    current asbestos lawsuits to Travelers for their handling to

21    provide both the defense and an indemnity in those cases.

22         In response to those requests, Travelers denied the

23    coverage, refused to accept the tender in those cases and, to

24    our surprise, filed this case in -- in Your Honor's court

25    asking for a complete indemnification of itself as having no

1  rights or responsibilities as to Southern from the beginning of

2  time through today.

3        Now, as context, there is a normal coverage --

4  insurance coverage litigation going on between Southern and all

5  of its insurers in state court in North Carolina, where these

6  rights and responsibilities will be determined in due course.

7  But for some reason, having received a number of tendered

8  lawsuits, USF&G filed the instant case in federal court asking

9  essentially for a get-out-of-jail-free card, that there is no

10  obligation on behalf Travelers to USF&G to Southern, despite

11  the existence of these certificates of insurance issued on

12  their letterhead and described in their policy.

13        Faced with that request for extraordinarily broad

14  relief, which is contrary to the documents we have been able to

15  locate, we asked Travelers to produce information regarding the

16  complete relationship between Southern Insulation and USF&G.

17  And as we experienced in the Covil case and as Justice Toal

18  described in her writings, we thwarted and have been thwarted

19  at every turn in this case, where although the relief sought by

20  way of USF&G's lawsuit is for a complete exoneration, that

21  there is no right or responsibility owed to Southern by

22  Travelers for all time, the company has limited its response to

23  the year of coverage that we have been able to locate and has

24  lodged a wide array of boilerplate objections to what we view

25  as relatively standard discovery seeking to keep together what

1  relationship Southern had with Travelers from the beginning,

2  1967, through the dissolution of the company in 1991. As a

3  receiver, we do not have access to existing vibrant corporate

4  records. The company has not been in existence for almost 30

5  years. And so we are left to rely on, in this case, discovery

6  to ascertain what documents Travelers had and what the

7  relationship between the companies was.

8         In addition to the problems with the types of

9  discovery responses they've provided to us, as was the case in

10  Covil in front of Chief Justice Toal, these responses are made

11  as if there was no corporate destruction policy and we know

12  that that happened. Justice Toal made her findings. We have

13  those documents. We know that when Travelers says "We've looked

14  and we can't find the documents," that a reason for that is

15  that they went and intentionally destroyed insurance and

16  policies, just like this one, in the 1980s. And for them to now

17  come forward as they did in front of Chief Justice Toal and

18  say, "We've look really hard, but we can't find them," we

19  believe is not the level of candor to the Court that is

20  required and is similar to what was done with -- with Chief

21  Justice Toal's case.

22         So if Travelers seeks broad relief that they owe us

23  nothing, that there is no relationship, and that there are no

24  policies, we believe that explanation must be couched in terms

25  of its own conduct, where members of Travelers management made

1    the decision to destroy policies of the type that we're talking

2    about here and then filed this case and says, "We don't owe any

3    obligation to Southern because we checked and we don't have any

4    policies, so please let us go."  And inherent in that is the

5    request that the search that Travelers has made is an honest

6    search. And based upon our experience with Travelers in a

7    similar case with Covil where Jean Toal found anything like an

8    honest search, we are concerned with the level of

9    responsiveness here and, as a result, filed this motion.

10          THE COURT:  Well, so you are telling the Court that,

11   I guess you couched it in the terms of a suspicion, that policy

12   relationships have been destroyed and they don't have anything,

13   correct?  But you don't know that for sure.

14          MR. EDWARDS:  Your Honor, what we do know for sure is

15   that policies in the 1980s that existed at USF&G were made

16   subject of a corporate-wide document purge. Because the

17   management and the lawyers at USF&G became concerned about the

18   mounting asbestos liabilities that the company faced and, as a

19   result, they made the decision to destroy those policies, to

20   put policyholders at a disadvantage when coming to seek benefit

21   of that coverage. We know that and that's in Jean -- in Chief

22   Justice Toal's orders, which I believe we have attached to our

23   papers.

24          THE COURT:  Well, I know, but what do you want --

25   what do you want this Court to do?

1    **MR. EDWARDS:**  Your Honor, what this Court is faced

2    with is the request from Travelers to say based upon their

3    search for those policies and their inability to find those

4    policies that this Court should declare that Travelers owes no

5    obligation to Southern.

6    **THE COURT:**  Well, now, wait a minute. We're not --

7    we're not at a summary judgment stage. We're at a motion to

8    compel stage. Your motions before me today, I believe, is a

9    motion to compel.

10    **MR. EDWARDS:**  That's correct, Your Honor.

11    **THE COURT:**  So as it relates so the motion to compel,

12    what are you requesting of the Court?

13    **MR. EDWARDS:**  Your Honor, thank you for the question.

14    What we're requesting is that Travelers be required to answer

15    fully the questions that we have posed to it with respect to

16    the policies that it issued during that time period to

17    Southern. And if the answer is that they cannot find those

18    policies, we believe that it is incumbent upon them to explain

19    why that is. Because it is -- it is clear that policies were

20    issued because we have certificates of insurance reflecting

21    those -- that policy on USF&G's letterhead. And for them to

22    say, "We've looked and we can't find the policy," without

23    further context as to why that policy no longer exists, we

24    think is misleading and unfair in light of the broad relief

25    that they seek.

1          **THE COURT:** Well, haven't they said that by their

2    normal retention policies that they don't have evidence of the

3    policy?

4          **MR. EDWARDS:** Your Honor, they have made reference to

5    a document retention policy and said that the policies may have

6    been destroyed in '71. That was not our experience in the Covil

7    case where we also found secondary -- what's called secondary

8    evidence of the policies of information related to the purchase

9    and sale of the policies even beforehand. But even if you

10   accept the assertion that these policies, which were operative

11   in 1967 -- this policy which was operative in 1967 and '68, it

12   should not have been destroyed in 1971. A policyholder has a

13   right to access its policies while --

14         **THE COURT:** I know -- I know -- excuse me for

15   interrupting you. But you are saying it shouldn't have been,

16   but let's assume that it was. I'm going to go back to my

17   question. Of course, I'm going to hear from the plaintiff in a

18   moment. But you are here on a motion to compel. If I give you

19   whatever relief you're asking for, what would that relief be?

20         **MR. EDWARDS:** Your Honor, we're asking for a complete

21   answer as to what happened to these documents.

22         **THE COURT:** Okay. Let me hear from the movant -- I

23   mean, excuse me, from the plaintiff.

24         **MR. LEE:** Thank you, Your Honor. This is Gary Lee. I

25   appreciate your time this morning. I do think the Court has hit

1    the nail on the head. I don't think that this motion to compel

2    was filed with the purpose of compelling anything. I think it

3    was filed to try to tell the Court a story and to retain the

4    Court for purpose of summary judgment at trial. We're going to

5    move past that and get back to the motion to compel.

6            USF&G responded to all of Southern's discoveries. In

7    those responses were lodged various objections and we believe

8    all of those objections are valid. But --

9        **THE COURT:**  What were your objection -- wait a

10   minute. What are your -- what are your objections to what they

11   asked for?

12       **MR. LEE:**  There are various -- and I will go through

13   them, Your Honor. Before I go through them, I wanted to get to

14   the point that Your Honor was raising. Despite our objections,

15   we have produced through a reasonable search, which we have

16   described to the defendant, every document that they have asked

17   for, if we have it, and every information that they've asked

18   for, if we have it. The bottom line is we have next to nothing

19   and we think there are good reasons and I can explain those,

20   Your Honor. And in fairness, I feel like I have to in light of

21   the accusations that are made but I do want to get to the

22   answer to the Court's question.

23           With respect to the -- I'll say the two primary

24   objections. Southern asked for us to search for documents that

25   went back to 1950, which is 17 years before Southern became a

1    corporation, before it even came into existence. It also asked

2    us to produce documents going up to 2019, 28 years after

3    Southern dissolved. We believe that a 50-, 60-, 70-year

4    timeframe to search for documents, when the only evidence that

5    exist are two unauthenticated certificates of insurance that

6    conflict with each other and that were not issued by USF&G or

7    sent to USF&G --

8         **THE COURT:**  Let me -- let me -- let me stop you right

9    there and ask you about that because I'm intrigued about that.

10   The two certificates of insurance that are in the record, I

11   believe you just mentioned you questioned their authenticity?

12        **MR. LEE:**  Yes, Your Honor. They have not been

13   authenticated as to where they came from by Southern. They just

14   were handed to us. They weren't signed by --

15        **THE COURT:**  I know. On the face of it, is there

16   anything that you have that indicates that they are not valid?

17        **MR. LEE:**  Yes, Your Honor. If you will look at the --

18        **THE COURT:**  What is that?

19        **MR. LEE:**  They've got different dates on them for

20   different policy periods. That would not be normal. Something's

21   not right with those certificates. In addition, Your Honor,

22   that's the first year that Southern came into existence and --

23   at least that's what they say -- and they did not appear to buy

24   workers compensation insurance in that first year, which they

25   had to by law. We are wondering whether certificates which can

1  be just sent by an agent without telling USF&G and without

2  sending them to USF&G, just sent out by the agent or whoever

3  they want to, but a broker, whether there really was insurance

4  purchased from us in that year or, instead, it was purchased

5  the next year from another company called Continental, which

6  Southern has not admitted was its insurer that next year. And

7  so we do believe that the certificates are suspect. I'm not

8  suggesting that there's anything criminal is going on, but

9  there's something that's not right. And they are the only

10  documents, the only documents that Southern has come up with

11  that any other insurer that -- or was one of Southern's

12  carriers came up with that USF&G has found after searching all

13  of its systems for all 50, 60, 70 years to find any indicia of

14  any kind that Southern ever made a claim, that they ever

15  noticed a letter, that they ever submitted an application, that

16  we ever issued a policy. There's nothing.

17        **THE COURT:**  So these were supposedly issued by the

18  Glover Brothers; is that right?

19        **MR. LEE:**  Yes, that's a broker, Your Honor.

20        **THE COURT:** That's a broker?

21        **MR. LEE:**  Yes.

22        **THE COURT:**  Were they an agent of USF&G?

23        **MR. LEE:**  No. They were Southern's agent. They're

24  Southern's broker. They were the ones who would purchased

25  insurance from USF&G. And so as a result, they belong to

1    Southern; they don't belong to USF&G.

2            **THE COURT:**  It's on a -- I'm just curious. It's on a

3    title of USF&G here.

4            **MR. LEE:**  Right. And so what happens is agents who --

5    who can purchase broker insurance for the various policyholders

6    for various companies, they get these certificates in blank.

7    And then, they fill them out -- they don't send them to us --

8    when they are asked to by somebody. And so it's possible. I

9    mean, Your Honor, we have not said it's impossible. It's

10   possible that a policy was purchased. With respect to this

11   motion, that policy was purchased more than 50 years ago. And

12   Southern never tendered us a claim until 2019. There is no

13   doubt and no reason why that policy wouldn't have been

14   destroyed a long time ago. But from our perspective, we have

15   doubts as to whether the policy was ever issued at all.

16           So to try to answer the Court's question about that

17   and to get through the objections we've raised, our first

18   objection was a time -- a scope of the time. That meant search

19   for 50 or 60 or 70 years, but Your Honor, we did it anyway. We

20   looked for anything we had that related to Southern, whether it

21   was reinsurance, whether it was an application, whether it was

22   a letter, whether it was a claim, whether it was policy,

23   whether it was any indication of any kind that we had issued a

24   policy. And there isn't anything.

25           So it's not simply a matter of supposedly destroying

1  policy. If a policy was issued, there's usually other things at

2  the insurance company that would suggest that a policy was

3  issued.

4          **THE COURT:**  Well, let me -- let me -- let me ask you

5  this -- excuse me, you said that you completely searched and

6  you informed the defendant that you searched fully and that you

7  don't have anything. Did you lodge other -- did you lodge --

8  then, did you lodge other objections to the request?

9          **MR. LEE:**  Sure. Yes, Your Honor.

10          **THE COURT:**  Isn't that inconsistent with an answer

11  that you searched and you don't have it?

12          **MR. LEE:**  I apologize, Your Honor. This may be what's

13  going on here, we responded to interrogatories and we responded

14  to document requests and looked at -- in reading each of them,

15  we looked at their breadth or whether they are objectionable,

16  whether they requested privileged information or the like and

17  we wrote down our objections, but then said subject to and

18  without waiving our objections, we will look. And we did look.

19  And we wrote in a sworn interrogatory answer. We described

20  exactly where we looked and what we did. And we told them what

21  we have found. And --

22          **THE COURT:**  So as far as -- so as far as what I have

23  to rule on, you are not standing by those objections then,

24  because they are moot because you said you did look and you

25  didn't find anything. So I don't need to -- in other words,

1    it's like you are abandoning those objections.

2         **MR. LEE:**  Your Honor, we wouldn't abandon the

3    objections in part because we didn't know what we would find.

4    So if someday something shows up, you know, we don't want to

5    abandon, for example, privilege or we don't want to -- we don't

6    want to -- I agree that our objections are moot. But I wouldn't

7    agree that a litigant needs -- needs to formally abandon them

8    because they can't find anything.

9         **THE COURT:**  Well, then, what you are telling me is I

10   don't need to rule on them because they are -- as far as this

11   hearing, they have no relevance.

12        **MR. LEE:**  I agree, Your Honor. They don't, because as

13   to every single objection other than privilege for which we

14   provided a privilege log, and those are only relating to 2019

15   and 2020 communications, there is no reason to rule because it

16   will do no good. What Mr. -- you got Mr. Edwards to the point.

17   What he seems to want is some sort of admission, for us to

18   write out an admission that we destroyed documents in 1984 and

19   that they must've been something to do with Southern and that

20   we have to admit that we did, in fact, issue policies to

21   Southern and that we threw them away. We're not going to admit

22   that. I don't think anybody can be compelled in response to a

23   motion to compel to do that.

24        And we have provided evidence to both Southern and to

25   the Court: number one, that if there was a '67 policy, it would

1    have been destroyed in the normal course in 1971; and number

2    two, and this is critically important, Your Honor, Southern,

3    pursuant to our discovery, admitted and provided us the

4    documentation showing us that a slew of other insurers wrote

5    its liability coverage from 1968. And so I think the motion to

6    compel needs to be read in that context.

7           But to answer your bottom line question, Your Honor,

8    there is nothing to rule on because it wouldn't do any good.

9    And we've told them that and we gave a sworn interrogatory

10   answer before they filed their motion to compel. So one wonders

11   why they filed.

12          **MR. EDWARDS:**  Your Honor, may I respond?

13          **THE COURT:**  Yes.

14          **MR. EDWARDS:**  Your Honor, we filed this motion

15   because we were investigating whether and to what extent there

16   was coverage written by USF&G. When we received the discovery

17   responses back from USF&G, they were replete with enormous --

18   enormous numbers of boilerplate objections.

19          **THE COURT:**  Well, now, you know -- now, you know that

20   those objections don't apply.

21          **MR. EDWARDS:**  Well, when we've met and had a meeting

22   to confer about this motion, Your Honor, that's what we

23   requested, is if that's your position, withdraw the objections

24   and stand on your answers. But given our experience with this

25   same defendant in this same context in front of Justice Toal

1   where she ruled, quote, rarely ever has this Court encountered

2   such a degree of corporate dishonesty as has been on display

3   from USF&G during these proceedings, close quote. It was of

4   concern for us --

5         **THE COURT:**  Well, I want you -- listen. I want you --

6   that's why I think I covered this. I think I covered it with

7   the other counsel, is that, as I understand your motion to

8   compel, it deals with all of what you call boilerplate

9   objections. And he now tells me he does not wish to -- he wants

10  to preserve them if something comes up in the future, but as

11  far as your request for production, they are not relying on

12  those, quote, boilerplate objections.

13        **MR. EDWARDS:**  Yes, Your Honor.

14        **THE COURT:**  So -- so -- so your motion to compel,

15  apparently, is satisfied.

16        **MR. EDWARDS:**  No, Your Honor. The objections were a

17  part of our motion, but the underlying answers were another

18  part.

19        **THE COURT:**  Well, let's -- let's -- tell me about

20  that.

21        **MR. EDWARDS:**  Yes, Your Honor. Our concern is that

22  USF&G was going to come to this Court in this hearing and

23  others and say exactly what Mr. Lee just said, which is, we've

24  looked and we can't find anything. And what's highly relevant

25  in that inquiry is why is that true if it, in fact, is true.

1    And the answer is what we discovered in the prior case, in the

2    Covil case.

3         **THE COURT:**  What you want this Court to do?

4         **MR. EDWARDS:**  I think that the answer to the question

5    should include "We can't find policies," and why. There should

6    be an explanation of what happened that explains the contexts

7    of that answer, because that answer --

8         **THE COURT:**  Haven't they -- haven't they said that,

9    that "We don't know of any policies. But if there were

10   policies, they were destroyed in our normal way of doing

11   business." Retention policy.

12        **MR. EDWARDS:**  Your Honor, I think the key is that in

13   1980 -- in the 1980s, USF&G underwent a plan to destroy the

14   policies with a specific plan that it would allow Mr. Lee to

15   say today what he just said to this Court, which is we looked

16   and we can't find it. And I think that the accurate answer to a

17   search for policies in this period must include that context,

18   that we can't find these policies, but in the 1980s, we went

19   through and destroyed them all with great vigor and on purpose.

20        **THE COURT:**  Mr. Lee, do you have any objection to

21   stating, either now or subsequently, as to why you would not

22   have any policies during that period of time?

23        **MR. LEE:**  Your Honor, not only do I not have any

24   objection to that, we've done that. We've told the other side

25   in our answers and we've told the Court today that if there was

1    a 1967 policy, which we believe may not have been issued, but

2    if it was, it was destroyed -- it would have been destroyed

3    pursuant to a 1970 document retention policy which we have

4    provided to Southern. They have that.

5          THE COURT: And you are certifying that no policies

6    were destroyed in this -- as it relates to this litigation for

7    the purpose of avoiding liability?

8          MR. LEE: Correct, Your Honor. And let me tell you

9    why: There were no claims. There was nothing to put USF&G --

10    there is no evidence that USF&G was ever put on notice in the

11    1960s, the 1970s, the 1980s, the 1990s or the 2000s.

12          THE COURT: Well, what happened with in -- what

13    happened in connection with the cases before Judge Toal?

14          MR. LEE: They started -- they appeared in 2019, last

15    year. They first started -- those are the first claims made

16    against Southern which have ever been tendered to USF&G or

17    Travelers, 50 years after this --

18          THE COURT: What happened that caused her to make

19    that finding against --

20          MR. LEE: Your Honor, that finding was in a

21    completely -- and that's important, Your Honor. That finding is

22    in a completely different case with completely different facts.

23    For example, in the Covil situation, there was correspondence

24    between Covil and USF&G in the 1970s about policies and about

25    plans. So there was -- there was evidence that policies existed

1    and that they existed in the 1970s before the 1980s and the

2    supposed purge. I'm not going to get into our view of what has

3    been called a purge, because I don't think it's true. But I'm

4    not debating that in this case, at least not yet. And the whole

5    point is the facts in Covil are entirely different. There is

6    silence, radio silence, not a shred of evidence, not one

7    communication, not one letter, nothing before 2019 vis-a-vis

8    Southern and USF&G.

9          And at this point, there's an argument being made

10   that I think is essentially fantasy. After that 1967 and the

11   certificates of insurance, which are about policies that could

12   have lasted no more than one year, there is abundant evidence

13   that Southern has provided us to -- provided to us of other

14   liability insurance, not USF&G, by -- selling insurance to

15   Southern from 1958 into the 1980s. In essence, Your Honor,

16   insurance don't buy double coverage. If they buy it from

17   Continental, if they buy it from Potomac, if they buy it

18   from Loyal, they don't buy it from USF&G. So the suggestion

19   that anything that was destroyed in 1984 that has to do with

20   Southern, I think, is a fantasy. I think it is made up and it's

21   just being told to Your Honor as if it might be true. The

22   evidence is contrary to that.

23          Again, Your Honor, in a motion to compel context, I

24   don't think there's anything to do other than they would have

25   liked us to give them a better explanation, they would like us

1  to give them an admission that we destroyed Southern documents

2  in 1980s. And the evidence is contrary to that, so why would we

3  say that?

4          **MR. EDWARDS:** Your Honor, this is exactly what this

5  same company said to us for two years in the Covil case, which

6  is, "We can't find anything. We can't find anything. We can't

7  find anything," until the Chief Justice Toal finally issued the

8  right order and we presented her with evidence of the purge and

9  they finally came clean with a whole bunch of evidence that

10  they had not produced for over two years.

11          **THE COURT:** I know. But for the last time, what you

12  want me to do?  If I rule in your favor, what do you want me to

13  do?

14          **MR. EDWARDS:** Your Honor, I think that we're entitled

15  to a straight answer as to the history of policies issued by

16  USF&G in this era. The notion that the policies were destroyed.

17          **THE COURT:** Wait a minute.

18          **MR. EDWARDS:**   Yes, sir.

19          **THE COURT:** A history of policies issued?  They say

20  they have no evidence to the policy issued to Southern.

21          **MR. EDWARDS:** Yes, Your Honor.

22          **THE COURT:** They can't give you a history if they

23  don't have a history.

24          **MR. EDWARDS:** Your Honor, maybe I misspoke. The

25  history that I think is relevant to that answer is what did

1  they do with policies issued by USF&G to companies like

2  Southern during this time frame in the 1980s.

3        **THE COURT:**  I think he --

4        **MR. EDWARDS:**  And the answer is --

5        **THE COURT:**  I'm going to ask him that, but I think

6  he's already answered that. If -- they don't have any of those

7  policies because they were removed pursuant to their retention

8  policy.

9        **MR. EDWARDS:**  Your Honor, if the policies were being

10  destroyed pursuant to that retention policy that Mr. Lee

11  described, there would have been no need for a purge. The

12  documents would have already been gone. But there was a purge

13  in the 80s. There was a corporate-wide systematic destruction

14  of policies just like this.

15        **THE COURT:**  All right. Tell me -- tell me what you

16  want.

17        **MR. EDWARDS:**  Your Honor, we would like an answer

18  that includes that fact, that policies like this, whether this

19  existed or not -- and I know they say they didn't -- it didn't

20  issue this policy and that they can't find it, but I think the

21  answer must include why, that policies just like this, during

22  this era, were intentionally destroyed as described by Justice

23  Toal in her orders.

24        [Phone ringing.]

25        **MR. EDWARDS:**  It was not --

1  **THE COURT:** Listen --

2  **MR. EDWARDS:** Yes, sir.

3  **THE COURT:** Wait a minute. He's not going to say that

4  because he's already stated to the Court that they didn't do

5  that kind of thing as it relates -- as it relates to your

6  claim.

7  **MR. EDWARDS:** Your Honor, there's no possible way

8  he could know whether that happened or not. What -- what we do

9  know is that --

10  **THE COURT:** Well, how can answer a question if he

11  doesn't know what happened or not?

12  **MR. EDWARDS:** Your Honor, backing up to the request

13  that they sought in this lawsuit --

14  **THE COURT:** Listen. Let me tell you something. Let

15  me tell you something: I studied this matter. And they're all

16  kind of -- you've got a lot going for you with the red flags

17  that were raised by Justice Toal, and I would love to help you

18  and order him to do whatever is reasonable as far as your

19  discovery. But I can't get a reasonable request from you that I

20  can order him to do. What you are -- what you are suggesting is

21  something that he's already answered.

22  **MR. EDWARDS:** Your Honor, I apologize if I'm not

23  being clear. It is our experience with USF&G with policies of

24  this era that they were destroyed in the mid-80s. And the

25  explanation that Mr. Lee has offered is an innocuous

1    explanation for what might have happened. But what we know

2    happened in the 1980s is that this type of policy was

3    destroyed. And I just would ask the Court that their answer,

4    which they offered in Covil for years that "We can't find

5    anything," should be placed in the appropriate context of their

6    pattern of misconduct. Because otherwise, it's an innocuous,

7    "We can't find it," and at the end of this case, that's what

8    they're going to ask the Court to rely on to find that there is

9    no obligation here.

10           **MR. WHITE:**  Your Honor, may it please the Court.

11           **THE COURT:**  Yes.

12           **MR. WHITE:**  I know he is speaking and maybe the Court

13   or Mr. Lee will objective to me speaking, but we -- what we're

14   basically saying to the Court is this is a case where they

15   brought it before Your Honor, who is one of our most

16   distinguished federal court judges, and they're asking you to

17   hear this case in a vacuum. And I know the Court's not going to

18   do that and I know you're going to want to know what's going on

19   elsewhere.

20           So the first thing they do, they come in today and

21   they say, "We're not saying that there has been any criminal

22   action on behalf of the receiver with these certificates, but

23   we don't -- we don't even -- we don't even agree that they're

24   authentic." And what's happened, Judge, when they come in and

25   say that, their hand has already been caught in the cookie jar

1    before Former Chief Justice Toal and it's evidenced by an

2    order.

3            So here's what we'd like from them --I'd be happy to

4    tell you what we'd like. We would like for them, as they have,

5    withdraw any objections, boilerplate language or otherwise.

6            **THE COURT:**  They -- that's been taken care of.

7            **MR. WHITE:**  Okay. Number two, we don't want the

8    discovery to be limited from 1967 to 1968. We want a full range

9    of discovery. And his characterization of 56 years might be a

10   misnumber, but we want a full discovery in regards to where we

11   are with the Southern receivership.

12           **THE COURT:**  I don't have any problem with that, but

13   what they're going to say is that he's already said -- and he

14   can correct me if I am wrong -- is that for all the years, they

15   don't have any records.

16           **MR. WHITE:**  The other thing, Spartanburg County

17   style, we want them to quit beating around the bush on the

18   answers and we want a full and complete answer with

19   explanation. Because we've already been with them for two years

20   where they have not come forth with complete answers --

21           **THE COURT:**  Complete answer as to what?

22           **MR. WHITE:** Well, like Mr. Edward said, in regards to

23   the purge. The purge is going to be an important in this case

24   and what happened. And the last thing that we would like is if

25   they are going to assume --

1       **THE COURT:**  Wait a minute. Before you go to the last

2   thing, that one you were just saying, an answer to what?

3       **MR. WHITE:**  Okay. We would like an answer as to what

4   were the circumstances in regards to the purge in 1984, before

5   and after and otherwise. And we believe, based on the

6   litigation that's gone on in South Carolina and other

7   jurisdictions, that they realized at some point that that was

8   going to be an enormous liability for them and, as a result,

9   they decided to do the purge. And you will get to see evidence

10  and you will get to see an expert opinion on that as we go

11  forward. But what we are trying to do is we're trying to do

12  timed down what we can do 30(b)(6) motions and be able to then

13  explore this case before Your Honor.

14      And the last thing is --

15      **THE COURT:**  Now, wait a minute. That had to do

16  with -- I'm trying to make notes here.

17      **MR. WHITE:**  I think it was the 1984 purge or the

18  purge in the 1980s.

19      **THE COURT:**  Thereabouts?

20      **MR. WHITE:**  Pardon me, Your Honor.

21      **THE COURT:**  Thereabout 1984?

22      **MR. WHITE:**  Yes, sir. And then the last thing, the

23  next thing is if there are not policies or there are not

24  certificates, there are other methodologies for trying to prove

25  insurance coverage, which is reinsurance or otherwise. And we'd

1    like those explanations. We would like to know who their

2    reinsurers were at the time --

3             **THE COURT:**  Has that been asked for and denied?

4             **MR. WHITE:**  I don't -- yes, sir.

5             **MR. LEE:**  That -- Your Honor, that -- Your Honor --

6    Your Honor, let me be clear. It was asked for. It was objected

7    to. We searched for it. There isn't any. We don't have

8    any reinsurers --

9             **THE COURT:**  And you -- and you told them?

10            **MR. LEE:**  And we put it -- all of these are in the

11   answers.

12            **THE COURT:**  Okay.

13            **MR. LEE:**  Everything that has been requested is in

14   the answers. They just don't like the ---

15            **THE COURT:**  Did you answer the fact of what he's

16   requesting, the reason for the 1984 thereabouts document

17   elimination?

18            **MR. LEE:**  We produced all the documents we have

19   relevant to --

20            **THE COURT:**  That's not what I'm asking. Did you give

21   them an answer as to the reason for the 1984 document

22   elimination and the circumstances surrounding it?

23            **MR. EDWARDS:**  In general terms, no. I don't think

24   that's been asked of us.

25            **THE COURT:**  I think I'm -- I'm going to order you to

1   do that. For clarification: I want you to respond -- I want you

2   to provide to the defendant the reasons and circumstances as it

3   relates to the 1984, or thereabouts, document elimination.

4           **MR. LEE:**  Your -- Your Honor, we have provided them

5   with an affidavit about that and we will --

6           **THE COURT:**  Well, I thought you just told me -- I

7   thought you just told me they never -- nothing -- they never

8   requested that hadn't been provided.

9           **MR. LEE:**  Not in this case, they haven't. But we took

10  everything in the Covil case, including the affidavits, the

11  explanations, the interrogatory answers, everything, and we

12  cross-produced them in this case so that this argument would

13  not be made, that there would be no suggestions that --

14          **THE COURT:**  It would not cause you any trouble to

15  redo it for this case.

16          **MR. LEE:**  Correct.

17          **MR. WHITE:**  And Your Honor, we've received, I believe

18  a limited privilege log. If that's the only privilege they're

19  going to assert in the case, that's fine. If they're going to

20  assert any other privileges, we would like a privilege log.

21          **MR. LEE:**  Your Honor, if I could just go through the

22  list, I'd be happy to do that and I can work backwards.

23          **THE COURT:**  Well, now, wait a minute.

24          **MR. LEE:**  We don't have --

25          **THE COURT:**  That -- that -- wait a minute. That's --

1  that's -- it's no sense going through that because you don't

2  have any documents that it apply to it.

3          **MR. LEE:**   Correct, Your Honor.

4          **THE COURT:**   You are reserving the right to raise it

5  if a document does show up.

6          **MR. LEE:**   Correct.

7          **THE COURT:**   All right. I believe that's all. Thank

8  you.

9          **MR. EDWARDS:**   Thank you, Your Honor.

10         **THE COURT:**   We stand adjourned.

11         **THE MARSHAL:**   All rise. This Court is now adjourned.

12      (The Court adjourns at 11:28 a.m.)

13

14                    * * * * * * * *

15                **C E R T I F I C A T E**

16     I certify that the foregoing is a correct transcript from

17  the record of proceedings in the above-entitled matter.

18

19  _____        August 19, 2020
                                            _____
20  Teresa B. Johnson, CVR-M-CM, RVR, RVR-M              Date

21

22

23

24

25